**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **SUK JAE CHANG, individually and on** | ) | |
| **behalf of classes of similarly situated** | ) | |
| **persons,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 11-10245-DJC** |
| | ) | |
| **WOZO LLC, TATTO, INC. and** | ) | |
| **ADKNOWLEDGE, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                    March 28, 2012

## I. Introduction

Plaintiff Suk Jae Chang ("Chang"), individually and on behalf of three purported classes of similarly situated individuals, brings this action against two Boston-based companies, Defendants Wozo LLC ("Wozo") and Tatto, Inc. ("Tatto") and a Missouri-based internet advertising company, Defendant Adknowledge, Inc. ("Adknowledge") (collectively, "the Defendants"). Chang alleges that he and members of the purported classes were the victims of a bait-and-switch scheme based on advertisements jointly created by the Defendants and advertised to individuals playing internet games. Chang alleges that Wozo and Tatto violated the federal Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. § 1693 _et seq_., and that Wozo, Tatto and Adknowledge all violated the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A. Wozo and Tatto have moved to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) for lack of subject matter jurisdiction, Adknowledge has moved to dismiss pursuant to Rule 12(b)(2) for lack of personal

jurisdiction, and all of the Defendants have moved to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons discussed below, the Defendants' various motions are DENIED.

## II. Burden of Proof and Standard of Review

### A. Rule 12(b)(1)

A federal case or controversy under Article III of the Constitution exists only when the party soliciting federal court jurisdiction has standing. Katz v. Pershing, LLC, 2012 WL 612793, at *3 (1st Cir. Feb. 28, 2012). To have constitutional standing a plaintiff must establish three elements: injury, causation, and redressability. Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)). "Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Id. (quoting Lujan, 504 U.S. at 561) (internal quotation marks omitted). Here, since the case is "at the pleading stage," the Court "must determine whether plaintiffs have sufficiently alleged facts required to meet the elements of Article III standing," Merriam v. Demoulas Super Mkts., 2012 WL 931347, at *2 (D. Mass. Mar. 20, 2012), and must "accept as true all well-pleaded factual averments in the plaintiff's . . . complaint and indulge all reasonable inferences therefrom in his favor." Deniz v. Mun'y of Guaynabo, 285 F.3d 142, 144 (1st Cir. 2002).

### B. Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that personal jurisdiction exists over the moving defendant. Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 8 (1st Cir. 2009). On such a motion, the Court considers "'whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts

essential to personal jurisdiction.'" Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995) (quoting Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992)). Under this standard, the Court "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Id. at 145. The Court must also "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998). Facts put forward by a defendant may also be considered, but "only to the extent that they are uncontradicted." Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007). Notwithstanding the liberality of this approach, the court will not "credit conclusory allegations or draw farfetched inferences." Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994).

### C. Rule 12(b)(6)

To survive a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), a complaint "must 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,' and allege 'a plausible entitlement to relief.'" Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 559 (2007)). "In resolving a motion to dismiss, a court should employ a two-pronged approach." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (applying Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949-50 (2009) and Twombly, 550 U.S. at 555). "Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). "Step two: take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Id. If they do,

"the claim has facial plausibility" and can withstand a motion to dismiss.  <u>Ocasio-Hernández</u>, 640

F.3d at 12 (quoting <u>Iqbal</u>, 129 S.Ct. at 1949).

**III.  Factual Background**

    **A.  Factual Allegations in the Amended Complaint[1]**

        1.  <u>Adknowledge and "Virtual Currency"</u>

According to Chang, the combination of social networking websites such as Facebook with

traditional video games has resulted in the growing popularity of role-playing and simulation games

set in "virtual worlds."  D. 23 ¶ 57.  The virtual worlds created by games like Second Life,

FarmVille, and Mafia Wars contain their own virtual economic structures, wherein game players

exchange "virtual currency" or goods within the game, usually to increase what Chang describes as

"their power or standing as a player."  D. 23 ¶ 57.  Some virtual currency platforms are monetized

in terms of actual, real currency–that is, a player can obtain virtual currency by either (1) using real

currency to purchase virtual currency within the game or from an online exchange, or (2) purchasing

products from the platform's advertising partners.  D. 23 ¶ 58.

Adknowledge is a Delaware corporation with its headquarters in Kansas City and with other

offices in the San Francisco Bay area, Los Angeles, New York City, Australia, Canada and the

United Kingdom.  D. 23 ¶ 10, 17; Affidavit of Adknowledge General Counsel Michael R. Geroe

("Geroe Aff."), D. 26-1 ¶ 2.  Adknowledge claims to be the largest privately-held internet

advertising network in the United States.  D. 23 ¶ 17.  As a service to the organizations (such as

Facebook and Zynga) that publish advertisements developed by Adknowledge, Adknowledge

reviews and assesses the contents of its advertisements and rates the advertisements on a spectrum

---

[1] The following allegations are drawn from Chang's Amended Complaint, D. 23, unless
noted otherwise.

ranging from "maximum user experience" (meaning a simple or inexpensive offer that yields less advertising revenue) to "maximum monetization" (meaning a costly or complex offer that yields high advertising revenue) to enable Adknowledge's publishers to choose how aggressive the advertisements on their websites will be. D. 23 ¶ 68. Adknowledge also owns and operates a virtual currency platform called "Super Rewards," the units of which are referred to as "Super Rewards Points." D. 23 ¶ 59. Super Rewards Points may be used in a wide variety of internet games. D. 23 ¶ 59.

### 2. Tatto and Wozo

Tatto is a corporation with its headquarters in Boston. Am. Compl., D. 23 ¶ 9. According to Chang, Tatto had a poor business reputation as being responsible for a variety of mobile phone and internet consumer "scams." D. 23 ¶ 31. Chang alleges that in 2008, Tatto was twice sanctioned and fined by the Attorney General of the State of Washington for deceptive advertising, D. 23 ¶ 33, was banned from Facebook in 2009 for sending deceptive advertisements via Facebook's network in violation of Facebook's policies, D. 23 ¶ 32, and that Zynga, a company that makes free internet games that contain advertisements, terminated its relationship with Tatto, with Zynga's CEO stating that "[w]e have worked hard to police and remove bad offers" and identifying Tatto as "the worst offender" in this regard. D. 23 ¶ 35.

In or about fall 2009, prior to the formation of Wozo, Tatto obtained the internet domain name "wozo.com" (the "Wozo website"). D. 23 ¶ 21. At the time, Tatto listed its CEO, Lin Miao ("Miao"), as the administrative, technical and registrant contact for the Wozo website, and Miao's e-mail address at "tattomedia.com" and Tatto's physical address at 10 High Street, Boston were provided as the contact information in the Wozo website's domain registration. D. 23 ¶ 21.

On or about July 26, 2010, Tatto and/or its representatives, employees, agents and assigns

formed Wozo as a limited liability company and transferred ownership of the Wozo website to the newly-formed company. D. 23 ¶¶ 22-23. Wozo was undercapitalized and did not have any employees. D. 23 ¶¶ 29-30. Wozo's officers were the principals, officers and/or founders of Tatto, and Wozo's business functions were performed by Tatto officers and employees. D. 23 ¶¶ 27, 29. Chang alleges that during regular business hours there was often no Wozo representative at Wozo's registered business address, which is located less than one block from Tatto's headquarters, and that Wozo did not conduct actual business at its registered address. D. 23 ¶¶ 8, 28.

Wozo's sole business activity was a "free" poster scheme central to this case (and discussed in more detail in a separate section below). D. 23 ¶ 24. On or about September 9, 2010, Tatto President Andrew Bachmann ("Bachmann") sent an e-mail to advertising affiliates identifying himself as a "Founder of Tatto" and inviting them to promote "a poster subscription offer called Wozo" that he had "recently founded." D. 23 ¶ 26. On or about November 12, 2010, Bachman sent another e-mail to advertising affiliates inviting them to promote the Wozo poster promotion. D. 23 ¶ 26. Tatto call center employees handled complaints from dissatisfied Wozo customers. D. 23 ¶ 29. Tatto employees received returned Wozo posters and stored them in various Tatto offices, including Miao and Bachmann's offices. D. 23 ¶ 29.

### 3. The "Free" Poster Scheme

Through the Wozo website, Wozo sold posters and fine art prints. D. 23 ¶ 40. Wozo asserted on the Wozo website that it had "100's of thousands of customers." D. 23 ¶ 40. After Tatto acquired the Wozo website in 2009 and created Wozo in 2010, Tatto and Wozo formed a "poster club," members of which would receive an automatic shipment of two posters per month in exchange for a $29.99 monthly membership fee. D. 23 ¶ 41.

Concurrent with the formation of the poster club, Tatto and Wozo launched a "free" poster

scheme.  D. 23 ¶ 42.  Tatto and Wozo created, developed and placed banners and other internet advertisements offering a free poster to consumers in return for a 99-cent shipping fee.  D. 23 ¶ 42. An internet user who clicked on one of these advertisements was redirected to an order form on the Wozo website to select a poster, provide shipping and contact information, and complete their order by submitting a billing address and debit or credit card information.  D. 23 ¶¶ 43, 45.  Consumers who completed an order form and provided payment information for the shipping fee were–unbeknownst to the consumer–enrolled in the poster club.  D. 23 ¶ 42.  Tatto and Wozo retained the payment information of poster club members.  D. 23 ¶ 42.  Unless the consumer cancelled their membership in the poster club within four days of ordering a "free" poster, they were charged $29.99 per month for their membership in the poster club.  D. 23 ¶ 42.[2]

The order form on the Wozo website included no information regarding the poster club, the charges associated with the poster club, nor any mechanism for cancelling a membership in the poster club, nor did it indicate that Wozo would retain any payment information submitted by the consumer.  D. 23 ¶ 45.  The order form did include a pre-checked box located next to the statement "I Agree to Terms and Conditions," D. 23 ¶ 45, but the text of that statement was not a hyperlink to any additional terms and conditions, D. 23 ¶ 47, nor was there any apparent way to navigate the website to discover any additional terms and conditions beyond the "free" poster and the 99-cent shipping charge.  D. 23 ¶ 45.  The order form did not include any contact information for Wozo or Tatto.  D. 23 ¶ 45.

Tatto and Wozo partnered with organizations involved in online advertising, internet gaming, and social networking to offer additional "free" benefits, including but not limited to providing

_____

[2] In some instances, Wozo would refund the monthly fee, but only after the consumer had shipped all posters back to Wozo (at the consumer's expense).  D. 23 ¶¶ 70-71.

"free" virtual currency, as an extra enticement to potential poster scheme consumers. D. 23 ¶ 56. Adknowledge was one of Tatto and Wozo's partners in this regard, and they created and developed a promotional campaign, including internet banners and other advertisements, offering both a "free" poster and "free" Super Rewards Points for a single 99-cent shipping fee. D. 23 ¶ 60. Adknowledge included contractual terms in its agreement with Wozo and Tatto to control the content of these advertisements. D. 23 ¶ 64. The advertisements did not mention the poster club, the charges associated with the poster club, or mechanisms for cancelling a membership in the poster club, nor did they indicate that Wozo would retain any payment information submitted by the consumer. D. 23 ¶ 60. Tatto and Wozo agreed to pay Adknowledge $19 for each consumer who purchased a "free" poster after clicking on one of these advertisements, and Tatto, Wozo and Adknowledge cooperated technologically to track and share information about the results of the promotion. D. 23 ¶ 62.

### 4. Chang

Chang resides in Arcadia, California. D. 23 ¶ 7. He uses Super Reward Points. D. 23 ¶ 72. In or about October 2010, he saw an internet advertisement for the "free" poster and Super Rewards Points scheme. D. 23 ¶ 73. He clicked on the advertisement, which redirected him to the order form on the Wozo website. D. 23 ¶ 73. The order form did not include information about the existence of the monthly membership product, its cost, or other terms and conditions of the transaction. D. 23 ¶ 73. Chang selected a poster from the Wozo website to obtain the promised Super Rewards Points and paid for the 99-cent shipping fee with his debit card. D. 23 ¶ 74. At no time during the checkout process was Chang informed that he would be charged for anything but the 99-cent shipping fee. D. 23 ¶ 74. Wozo later charged Chang's debit card for a $29.99 monthly membership subscription fee. D. 23 ¶ 74.

**B. Proffers of Jurisdictional Evidence**

     1. <u>Geroe Affidavit Proffered by Adknowledge</u>

As noted above, Adknowledge contests that this Court has personal jurisdiction over it and in support of this position submitted the affidavit of Adknowledge General Counsel Michael R. Geroe ("Geroe"). D. 26-1. Geroe asserts that Adknowledge's Super Rewards platform "provides an online game publisher with an 'offer wall' the publisher can make available to its players," which features ads from many advertisers "such as Wozo.com." D. 26-1 ¶¶ 11-12. According to Geroe, "[a]ds on the offer wall are displayed somewhat like classified ads run in a newspaper," and "[g]ame publishers can make money when users respond to an ad on the offer wall." D. 26-1 ¶¶ 13-14. Accordingly, game publishers "grant points or credits useful in their game to players as an incentive to visit the offer wall and respond to an ad. When a player clicks on an offer, the player is directed to the advertiser's website . . . to complete any subsequent transaction with the merchant." D. 26-1 ¶ 14. Geroe asserts that the advertiser's website is "outside of the control of either Adknowledge or the game publisher." D. 26-1 ¶ 14. Geroe also asserts that "Super Rewards does not initiate contact with consumers," although he concedes that "it provides customer service for the game publisher relating to customer inquiries about receiving points following their participation in an offer." D. 26-1 ¶ 28.

According to Geroe, as a general matter, "Adknowledge facilitates the publication of advertisements," but "does not "create or develop advertising content for or on behalf of the advertisers," "does not contribute to or have any ability to control representations made on an advertiser's web site after the consumer clicks on an ad and leaves the offer wall," and "plays no role in fulfilling the advertiser's product or offer" beyond crediting consumers "with the appropriate

game publisher's points upon receiving confirmation from the advertiser that the consumer participated in the offer advertised." D. 26-1 ¶¶ 16-19. Specifically, Geroe acknowledged that while Wozo and Tatto "advertised wall-hanging posters on the Super Rewards offer wall . . . Adknowledge did not control the content of the Wozo website" and "did not create any advertisements for Wozo." D. 26-1 ¶¶ 20-22. "Following reasonable investigation," Geroe stated that "to the best of my knowledge and belief, no person at Adknowledge had direct contact or communication with a person at Wozo pertaining to the advertisement of wall-hanging posters on the Super Rewards offer wall." D. 26-1 ¶ 24. Geroe also noted that Wozo agreed to Adknowledge's terms of service, which according to Geroe provide "that the transaction occurred in Kansas City, Missouri, was governed by Missouri law, and that any dispute would be resolved in Missouri." D. 26-1 ¶ 25.

Finally, Geroe asserts that Adknowledge has no offices, statutory agents, telephone listings, mailing addresses, bank accounts, or licenses in Massachusetts, nor does it advertise in Massachusetts newspapers, magazines, or other print, radio or television media. D. 26-1 ¶ 23, 35-38.

### 2. Johnson Declaration Proffered by Chang

Chang responded to the Geroe affidavit by submitting the affidavit of a consumer who contacted Adknowledge to complain after she was charged $29.99 after participating in the "free" poster and Super Rewards Points scheme and placing an order via the Wozo website. Declaration of Sarah Johnson ("Johnson Dec."), D. 32. Johnson, who lives in Michigan, asserts that on October 18 and 19, 2010, she exchanged e-mails with an Adknowledge employee who identified herself as a representative of "Super Rewards Customer Service," and that in response to Johnson's complaints

10

about being unwittingly enrolled in the poster club and charged $29.99, the Adknowledge employee stated that "the offer does indicate that a charge of $29.99 will be made to qualify for [Super Rewards] points." D. 32 at 1-2; D. 32-1 at 2. The e-mails discussed in the Johnson Declaration are attached as an exhibit thereto. D. 32-1.

### 3. Contract between Wozo and Adknowledge

After a colloquy between the Court, counsel for Adknowledge and counsel for Chang at the motion hearing, Adknowledge agreed to provide the Court with a copy of the contract between Wozo and Adknowledge to determine if the contract identified Wozo's location and put Adknowledge on notice that it was entering a contractual relationship with a Massachusetts company. Adknowledge subsequently submitted the affidavit of Jeremy Fisher ("Fisher"), the Director of Adknowledge's "BidSystem." D. 40. Fisher asserts that on August 31, 2010, Wozo entered into two agreements with Adknowledge, the first of which provides "general terms and conditions for Adknowledge's BidSystem service," and the second of which "provides more specific terms relating to Adknowledge's Rewards network which apply to the kind of offers at issue in this lawsuit." D. 40 ¶¶ 2-4. Attached to the affidavit were what Fisher describes as "true and correct cop[ies] of [each] agreement at the time Wozo entered into it." D. 40 ¶¶ 3-4 (referring to D. 40-1 and 40-2). The documents appear to be form documents proffered to entities that contract with Adknowledge. D. 40-1, 40-2. Adknowledge did not submit any documentation to the Court showing that Wozo agreed to the terms set forth in the documents or showing what information Wozo provided to Adknowledge if and when it agreed to such terms. As a general matter, however, the form documents do suggest that Adknowledge was aware of the physical location of advertisers like Wozo that contract with Adknowledge via its BidSystem service. See, e.g., D. 40-1 at 3 ¶ 10

("after termination or expiration of this Agreement, any amount remaining in an Advertiser account under $50 shall be forfeit to Adknowledge; Adknowledge shall mail one check, first class, to the last known address of Advertiser for any greater amount"); D. 40-2 (same).

Chang replied to the Fisher affidavit by submitting purported screenshots of Adknowledge's on-line sign-up mechanism for BidSystem. Pl. Response, D. 41 at 3-4. The screenshots demonstrate that the "Account Information" required by Adknowledge to open a BidSystem account includes a company name, a company address, and the name and address of both a management contact and a billing contact. D. 41 at 3-4. The screenshots also suggest that Adknowledge reviews the information submitted through the BidSystem service. D. 41 at 4.

## IV. Procedural History

By letter dated January 13, 2011, Chang sent a Mass. Gen. L. c. 93A demand letter to the Defendants seeking, on his own behalf and purportedly on behalf of all others similarly situated, "the maximum damages permitted by law, including at a minimum the $25 statutory damages per [c]lass member, together with all related costs and attorney's fees that Mr. Chang and the class have incurred." Wozo and Tatto's Motion to Dismiss, Ex. 1-A (93A Demand Letter), D. 25-2 at 5.

By letter dated February 11, 2011, Wozo offered to pay Chang $350 plus reasonable attorneys fees and asserted that this amount "fully satisfies Mr. Chang's claim and provides him with all of the relief to which he would be entitled were he to prevail in this case," and stated that "no payment is being made to the putative class Mr. Chang claims to represent, as no class exists here." Wozo and Tatto's Motion to Dismiss, Ex. 1-B (Wozo 93A Offer Letter), D. 25-2 at 11. Wozo enclosed a cashier's check for $350 with its letter. D. 25-2 at 11. Chang later rejected this offer. Wozo and Tatto's Motion to Dismiss, Ex. 1-C, D. 25-2 at 13.

On February 14, 2011, Chang filed a three-count complaint in this Court on his own behalf and on behalf of three overlapping purported classes. D. 1 ¶¶ 53-65. The first count was on behalf of a purported class of individuals "who participated in Wozo's 'free' poster promotion and were charged for a monthly membership in the Wozo poster club even though the monthly membership was not referenced on the pages of the Wozo [w]ebsite that were necessarily viewed to complete the transaction," and alleged that Wozo and Tatto violated Mass. Gen. L. c. 93A. D. 1 ¶¶ 58, 66-85. The second count was on behalf of a purported class of individuals who both were members of the first class and "were offered Super Rewards points for their participation in [Wozo and Tatto's] 'free' poster promotion and were charged for a monthly membership in the Wozo poster club even though the monthly membership was not referenced on the pages of the Wozo [w]ebsite that were necessarily viewed to complete the transaction," and alleged that Adknowledge violated Mass. Gen. L. c. 93A. D. 1 ¶¶ 59, 86-100. The third count was on behalf of a purported class of individuals who were both members of the first class and "whose debit cards were charged for a monthly membership subscription in the Wozo poster club even though the monthly membership was not referenced on the pages of the Wozo website that were necessarily viewed to complete the transaction," and alleged that Wozo and Tatto violated the EFTA. D. 1 ¶¶ 60, 101-117. On April 15, 2011, Chang amended his complaint to add factual allegations, but did not alter the definitions of the purported classes or the nature of the three counts alleged against the Defendants. D. 23 ¶¶ 77-79, 85-136.

On April 29, 2011, Wozo and Tatto moved to dismiss under Rule 12(b)(1), alleging that Wozo's settlement offer deprived Chang of legal standing, and under Rule 12(b)(6), alleging that Chang failed to state a claim upon which relief can be granted. D. 25. That same day, Adknowledge

moved to dismiss under Rule 12(b)(2), alleging that this Court lacked personal jurisdiction over Adknowledge, and under Rule 12(b)(6), alleging that Chang failed to state a claim upon which relief can be granted.  D. 26.

The Court held a hearing on the various motions, took the motions under advisement, and permitted Chang and Adknowledge to file supplemental materials regarding personal jurisdiction, including documentation of the contractual relationship between Adknowledge, Wozo and Tatto. 7/27/11 docket entry.  Adknowledge and Chang each filed supplemental materials.  D. 40; D. 41; D. 42.

## V.  Discussion

### A.  Standing

A plaintiff must have suffered an injury to have standing to bring a claim in federal court. Katz, 2012 WL 612793 at *3(citing Lujan, 504 U.S. at 560-61).  Wozo and Tatto argue that any injury suffered by Chang was cured when Wozo offered to settle his claims for $350 plus reasonable attorneys fees, notwithstanding Chang's rejection of Wozo's offer, and that accordingly Chang lacks standing to bring this suit and the Court lacks subject matter jurisdiction to hear it.  Wozo and Tatto's Memo, D. 25-1 at 14-17.  The Court rejects this argument.

First, Wozo and Tatto are clearly mistaken when they assert that Wozo's settlement offer "afforded [Chang] all of the relief he could obtain if he were to prevail at trial."  D. 25-1 at 14.  To the contrary, Chang's 93A demand letter clearly indicated the class nature of his claims and sought relief for all members of the class.  D. 25-2 at 5.  Although Chang's 93A demand letter did not specify an aggregate amount requested on behalf of he the class (asking instead for a minimum of $25 damages per class member, D. 25-2 at 7), Chang's amended complaint asserts that the classwide

amount in controversy exceeds $5,000,000. D. 23 ¶ 13. At the motion to dismiss stage, and absent any evidentiary submissions to the contrary by the Defendants, the Court accepts this allegation as true. Deniz, 285 F.3d at 144. Accordingly, Wozo's offer of $350 plus costs to Chang, coupled with Wozo's express statement that "no payment is being made to the putative class Mr. Chang claims to represent," D. 25-2 at 11, was clearly insufficient to remedy the classwide injury alleged by Chang and fell well short of the maximum relief Chang might obtain should he and the purported classes he seeks to represent ultimately prevail at trial.[3]

Second, even if Wozo's offer to Chang could be read as a redress of Chang's injury sufficient to guarantee that he "no longer has a personal stake in the case," Wilson v. Sec'y of Health & Human Servs., 671 F.2d 673, 679 (1st Cir. 1982) (cited by Wozo and Tatto, D. 25-1 at 16), it is highly unlikely that the case as a whole would be moot. "[O]rdinarily[,] the mootness of the substantive claim of the named plaintiff in a purported but uncertified class action moots the entire case," but "[s]ome courts have recognized a limited exception to this general rule if the defendant has deliberately and artificially created mootness by satisfying the named plaintiff's claim, effectively avoiding judicial resolution of a matter by 'picking off' the named plaintiffs." Wilson, 671 F.2d at 679; see also Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper, 445 U.S. 326, 339

---

[3] Wozo and Tatto also argue that, to the extent Plaintiff's claims have not been mooted, his recovery should be limited to the amount specified in Wozo's rejected settlement offer. Wozo and Tatto Memo, D. 25-1 at 17. Under chapter 93A, "[a]ny person receiving [a chapter 93A] demand for relief who . . . makes a written tender of settlement which is rejected by the claimant may, in any subsequent action . . . limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner." Mass. Gen. L. c. 93A, § 9(3). In the chapter 93A context, "the reasonableness of the tender is a question of fact," not purely a question of law, and is "determined in light of the attendant circumstances," RGJ Assocs., Inc. v. Stainsafe, Inc., 338 F. Supp. 2d. 215, 239 (D. Mass. 2004), and as such is inappropriate, on the present record, for the Court to resolve at this juncture.

(1980) (noting that "[r]equiring multiple plaintiffs to bring separate actions, which effectively could be 'picked off' by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions; moreover it would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement"); Griffith v. Bowen, 678 F. Supp. 942, 946 (D. Mass. 1988) (stating that a defendant's "voluntary payment" to named plaintiffs in a purported class action was "deceptively kind" and "conjures up the spectre that the [defendant] may, in effect be attempting somehow to end this litigation before the claims presented here are addressed").

Finally, as a matter of Massachusetts law, efforts by a defendant to "pick off" named plaintiffs in a purported class action have been discussed with disfavor in the specific context of chapter 93A claims. In Meaney v. OneBeacon Ins. Grp., LLC, No. 07-1294-BLS2, 2007 WL 5112809, at *2 (Mass. Super. Ct. June 12, 2007) (Gants, J.), the named plaintiff in a purported class action moved to amend her complaint, which initially included only common law claims, to add classwide chapter 93A claims; the defendant opposed the motion on the ground that the defendant had offered to settle the plaintiff's individual chapter 93A claim. Now-Supreme Judicial Court Justice Gants granted the plaintiff's motion and held that the defendant:

> may not avoid a class action simply by paying the amount due to the named plaintiff. The plaintiffs in their complaint have raised a significant legal claim which is entitled to resolution. . . . [The defendant] cannot evade resolution of this legal question, involving small amounts of money for each individual [plaintiff] but larger amounts of money for the putative class . . . simply by paying [the small amount] to the named plaintiff, since the plaintiff seeks to act on behalf of the class of insureds similarly situated. Rather, [the defendant] can evade resolution of this issue only if [defendant] were to commit to paying [the requested amount] to all [plaintiffs].

Meaney, 2007 WL 5112809 at *2 (granting motion to amend). At the current stage of this litigation, the Court must "indulge all reasonable inferences" from Chang's factual allegations "in his favor,"

<u>Deniz</u>, 285 F.3d at 144, and Wozo's settlement offer, viewed in that light, appears to be an attempt to "pick off" Chang.

Accordingly, the Court rejects Tatto and Wozo's challenge to Chang's standing and to this Court's subject matter jurisdiction.

### B.  Personal Jurisdiction

Adknowledge argues that this Court lacks personal jurisdiction over it.  "In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction 'is the functional equivalent of a state court sitting in the forum state.'" <u>Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 51 (1st Cir. 2002) (quoting <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1387 (1st Cir. 1995) (further citation omitted)).  Accordingly, this Court's personal jurisdiction may not exceed the limits set by Massachusetts' long-arm statute and the Constitution.  <u>Lyle Richards Int'l, Ltd. v. Ashworth, Inc.</u>, 132 F.3d 111, 112 (1st Cir. 1997). Because courts construe "the Massachusetts long-arm statute as being coextensive with the limits permitted by the Constitution," this Court may "turn directly to the constitutional test for determining specific jurisdiction."  <u>Adelson v. Hananel</u>, 652 F.3d 75, 80 (1st Cir. 2011).

There are two types of personal jurisdiction:  specific and general.  <u>Cossaboon v. Me. Med. Ctr.</u>, 600 F.3d 25, 31 (1st Cir. 2010).  Specific jurisdiction exists where the plaintiff's cause of action arises from or relates directly to the defendant's contacts with the forum state, <u>Pritzker v. Yari</u>, 42 F.3d 53, 60 (1st Cir. 1994); general jurisdiction is broader, and "subjects the defendant to suit in the forum state's courts 'in respect to all matters, even those that are unrelated to the defendant's contacts with the forum.'"  <u>Cossaboon</u>, 600 F.3d at 31 (quoting <u>Phillips Exeter Acad. v. Howard</u>

Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999)).[4]  "The First Circuit employs a tripartite analysis to determine whether specific jurisdiction is appropriate:  1) whether the claims arise out of or are related to the defendant's in-state activities, 2) whether the defendant has purposefully availed itself of the laws of the forum state and 3) whether the exercise of jurisdiction is reasonable under the circumstances."  Pesmel N. Am., LLC v. Caraustar Indus., Inc., 754 F. Supp. 2d 168, 172 (D. Mass. 2010).  The first prong, relatedness, "is a 'flexible, relaxed' standard that focuses on the nexus between the plaintiff's claim and the defendant's contacts with the forum state."  Id. (quoting Astro-Med, 591 F.3d at 9.  One co-defendant may have its contacts with a state imputed to another co-defendant where the co-defendants lead "the public to believe they were co-venturers" or where one co-defendant ratifies the other co-defendant's transactional contact with the forum state by "knowingly accepting the benefits of the transaction."  Daynard, 290 F.3d at 57, 60.  The second prong, purposeful availment, requires some act or series of acts "by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  Hanson v. Denckla, 357 U.S. 235, 253 (1958).  The purposeful availment test "focuses on the defendant's intentionality," and "is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts."  United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 623-24 (1st Cir. 2001).  The final prong, reasonableness, turns on a series of so-called "Gestalt factors," including:  (1) the

---

[4] In their briefs, both Adknowledge and Chang placed more emphasis on the issue of specific jurisdiction than on the issue of general jurisdiction. D. 26 at 9-15, D. 31 at 13-20; D. 38 at 2-7; D. 39 at 4-7.  Because, as discussed below, the Court here does have personal jurisdiction over Adknowledge based on specific jurisdiction, the Court need not address whether it has the same based on general jurisdiction.

defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. Cossaboon, 600 F.3d at 33 n. 3.

Chang's allegations and his evidentiary proffers in support of jurisdiction, taken as true and construed in the light most favorable to jurisdiction, Foster-Miller, 46 F.3d at 145; Mass. Sch. of Law at Andover, 142 F.3d at 34, are sufficient to establish that this Court has specific personal jurisdiction over Adknowledge. As to relatedness, Chang's claims arise out of 1) various internet advertisements asserting that consumers who pay a single 99-cent fee would receive both a poster and Super Rewards Points, and 2) the Wozo website transaction wherein consumers were allegedly informed that they were agreeing only to a single 99-cent payment but were in fact charged $29.99 fees on a recurring monthly basis. While the parties dispute whether the advertisements qualify as contacts with Massachusetts (with Chang pointing both to Wozo's role in crafting the advertisements and its status as a company headquartered in Massachusetts and to Chang's allegation that at least some class members are Massachusetts residents, D. 31 at 14-15, and Adknowledge pointing both to the fact that Chang himself is not a Massachusetts resident, and to the text of the contract between Adknowledge and Wozo, which enabled the creation of the advertisements, limited Adknowledge's role in the content and placement of the advertisements, and stated that "the parties' transaction occurred in Kansas City, was governed by Missouri law, and that any dispute [over the terms of the contract] would be resolved in Missouri," D. 27 at 7-8), Adknowledge has not disputed that the subsequent transaction on the Wozo website is a Massachusetts contact. D. 27 at 7. Accordingly, the Court need not resolve the dispute over the jurisdictional import of the advertisements, because

the Wozo website transaction(s) can be imputed to Adknowledge for jurisdictional purposes.  The public could have been led to believe–and Chang alleges that both he and others[5] did in fact believe–that entering financial information on the Wozo website would result in the joint provision of a poster (from Wozo in Massachusetts) and Super Rewards Points (from Adknowledge).  Further, based on the Johnson Declaration, it appears that Adknowledge specifically held itself out as an authority on the legitimacy of financial transactions made on the Wozo website.  D. 32 ¶¶ 4-5. Additionally, Chang alleges that Adknowledge received $19 for each money-for-posters-and-Super-Rewards-Points transaction processed on the Wozo website, D. 23 ¶ 62, an allegation which, if true, would constitute Adknowledge's knowing receipt of the benefits of the Wozo website transaction sufficient to ratify that transaction.  Taken together and viewed in the light most favorable to jurisdiction, these factual allegations and evidentiary proffers are sufficient to impute the Wozo website transactions to Adknowledge for the limited purpose of establishing personal jurisdiction. Daynard, 290 F.3d at 57, 59-60.

As to purposeful availment, although Adknowledge originally disputed whether "Adknowledge knew that Wozo was in Boston," D. 27 at 13, the contractual language and BidSystem screenshots subsequently provided to the Court by the parties clearly suggest that Adknowledge did in fact know that Wozo and Tatto were both based in Massachusetts. Accordingly, Adknowledge was in a position to "expect, by virtue of the benefit [it] receive[d]" from individual consumer transactions exchanging money for Wozo's posters and Adknowledge's Super Rewards Points, "to be subject to [a Massachusetts] court's jurisdiction" in the event that legal

---

[5] See D. 23 ¶ 71 (attaching screenshots of consumer complaints mentioning both posters and Super Rewards Points).

disputes arose out of those transactions.  <u>Swiss Am. Bank, Ltd.</u>, 274 F.3d at 624.[6]  Indeed, the Johnson Declaration suggests that Adknowledge actually received consumer complaints about Wozo website transactions and responded to these complaints by defending the Wozo website transaction as valid.  Adknowledge was clearly in a position to expect that it could be haled into court alongside Wozo if, as here, the aforementioned consumer complaints ultimately formed the basis of legal claims.

The Gestalt factors also tip in favor of jurisdiction.  Adknowledge's burden of appearing from Missouri is not overly onerous, especially in light of the fact that Adknowledge has offices not only in Missouri but also in New York.  Massachusetts has a significant interest in resolving disputes about the propriety of the conduct of Massachusetts businesses, including conduct jointly undertaken by Massachusetts business such as Wozo and Tatto working in concert with out-of-state businesses such as Adknowledge.  Both Chang's interest in obtaining convenient and effective relief and the judicial system's interest in obtaining the most effective resolution of Chang's claims recommend a single action in this Court rather than separate actions against Adknowledge in a separate forum and against Wozo and Tatto here.  The final factor, the common interest of all sovereigns in promoting substantive social policies, is not to the contrary.

### C.  Rule 12(b)(6)

The Defendants, Tatto, Wozo and Adknowledge, assert among them five distinct grounds for dismissing Chang's amended complaint for failing to state a claim upon which relief can be

_____

[6] Adknowledge's argument that the purposeful availment prong is not met here is directed entirely at the allegedly Missouri-based agreements between Adknowledge and the advertisements that were created as a result of those agreements.  Wozo and Tatto, D. 27 at 11-12.  As discussed above, because the Wozo website transactions can be imputed to Adknowledge for jurisdictional purposes, the Court need not address Adknowledge's argument in this regard.

granted. The Court will address each argument in turn.

1. Injury

First, Tatto and Wozo argue that the chapter 93A claims in Chang's amended complaint must be dismissed because claims brought under that chapter require a showing of loss or injury and Chang cannot show any injury in light of the rejected settlement offer proffered by Wozo. D. 25-1. This argument is unavailing for all the reasons discussed above in the Court's analysis of Tatto and Wozo's 12(b)(1) motion to dismiss, which was similarly based on the incorrect assertion that Wozo's settlement offer was sufficient to cure the injury alleged in Chang's 93A demand letter and subsequent complaint filed in this Court.

2. "Authorization" under EFTA

Next, Tatto and Wozo argue that Chang's EFTA claim must be dismissed. EFTA permits "[a] preauthorized electronic fund transfer from a consumer's account" when it is "authorized by the consumer . . . in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). Tatto and Wozo allege that the $29.99 monthly fees charged to Chang and purported class members were authorized and consistent with EFTA because:

> the Wozo website contained a check box that indicated that all customers, including Plaintiff, "agree[d] to all terms and conditions," [D. 23 ¶ 47,] including the terms of the membership and fees related thereto. Thus, Plaintiff was, at the very least, informed that there were additional terms and conditions that applied to his purchase, but he nevertheless chose not to determine what they were, instead submitting his debit card information and receiving his chosen poster and promised club membership.

D. 25-1 at 20. The allegation that Chang "chose not to determine" the content of any "additional terms and conditions" is immaterial. Chang's amended complaint clearly alleges that he agreed to pay for a one-time 99-cent shipping fee, that he was instead charged a recurring $29.99 monthly fee,

and that there was no apparent way for a consumer to navigate the Wozo website to discover any additional terms and conditions beyond the promise of Super Rewards Points, a "free" poster and a 99-cent shipping charge.  D. 23 ¶¶ 45, 47, 73-75.  To the extent that Tatto and Wozo intend to assert that the "terms and conditions" associated with the Wozo website did in fact include a recurring $29.99 fee (and thus that Chang did in fact authorize Wozo to collect a $29.99 fee from Chang), such assertion is a factual dispute with Chang's amended complaint and is, accordingly, inappropriate for resolution in the context of a motion to dismiss.

### 3. Allegations Against Tatto

Tatto and Wozo's final argument is that Chang's claims against Tatto should be dismissed, both because Chang may not pierce the corporate veil between Tatto and Wozo to hold Tatto responsible for Wozo's conduct and because Chang's allegations specific to Tatto are insufficient to satisfy the higher pleading standard required by Fed. R. Civ. P. 9(b) for allegations of fraud.

Under Massachusetts law, corporations "ordinarily are regarded as separate and distinct entities." Scott v. NG U.S. 1, Inc., 450 Mass. 760, 766 (2008).  In two situations, however, courts may "pierce the corporate veil" between parent and subsidiary corporations: first, "where the parent exercises 'some form of pervasive control' of the activities of the subsidiary 'and there is some fraudulent or injurious consequence of the intercorporate relationship,'" id. (quoting My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619 (1968)), and second, "when there is a confused intermingling of activity of two or more corporations engaged in common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." My Bread Baking, 353 Mass. at 619.

In applying this veil-piercing analysis, Massachusetts law looks to the following twelve factors: (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud. Attorney General v. M.C.K., Inc., 432 Mass. 546, 555 n. 19 (2000) (citing Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985)). "The factors are weighed, not counted," George Hyman Constr. Co. v. Gateman, 16 F. Supp. 2d 129, 158 (D. Mass. 1998); a dual showing of "common ownership and control" and "funds used interchangeably" may be sufficient. Pepsi-Cola Metro. Bottling, 754 F.2d at 15. Ultimately, to pierce the corporate veil, a court must conclude after evaluating these factors "that the parent corporation directed and controlled the subsidiary" and "used it for an improper purpose." Scott, 450 Mass. at 768.

Here, Chang has alleged, among other things, that Tatto created and owned Wozo (consistent with the first factor enumerated in M.C.K.), D. 23 ¶ 22, 30; Tatto controlled Wozo in its entirety and Tatto employees conducted all of Wozo's business (consistent with the second, tenth and eleventh factors), D. 23 ¶¶ 24-27, 29; Tatto stored, received and controlled merchandise that was allegedly Wozo's (or, conversely, that Tatto's offices were in fact Wozo's offices) (consistent with the third factor), D. 23 ¶¶ 28-29; Wozo was undercapitalized (consistent with the fourth factor), and that Tatto created Wozo for the purpose of conducting allegedly fraudulent activities without drawing the scrutiny associated with Tatto's reputation for scurrilous business dealings (consistent with the

twelfth factor), D. 23 ¶ 22, 30-36. Taken as true, as they must be when resolving a motion to dismiss, these allegations are more than sufficient to permit the conclusion that Tatto directed and controlled Wozo and used Wozo for an improper purpose. Accordingly, at least for the purposes of this motion to dismiss, it is appropriate for the Court to treat Tatto and Wozo as alter egos. <u>Scott</u>, 450 Mass. at 768.

Treating all of the allegations directed at Wozo in Chang's amended complaint as allegations directed at both Wozo and Tatto, it is clear that the allegations against Tatto, to the extent they sound in fraud, are–contrary to Wozo and Tatto's argument, D. 25-1 at 21-22, 24-26–sufficient to satisfy the special pleading standard for fraud set forth in Rule 9(b),which states that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Under that heightened standard, a plaintiff must identify the fraudulent statement or representation, the person making the statement, and when the statement was made." <u>Crisp Human Capital Ltd. v. Authoria Inc.</u>, 613 F. Supp. 2d 136, 140 (D. Mass. 2009) (citing <u>Rodi v. S. New Eng. Sch. of Law</u>, 389 F.3d 5, 15 (1st Cir. 2004)). Here, Chang alleges that the representation that consumers could exchange a single 99-cent fee and receive a "free" poster from Wozo and Tatto and Super Rewards Points from Adknowledge was fraudulent where in fact they were being unknowingly charged a $29.99 poster club monthly fee, and that it was made by Wozo and Tatto on the Wozo website and in the internet advertisements mediated by Adknowledge (to the extent that internet advertisements represented that consumers would receive a "free" poster from Wozo for 99 cents) at the various times when Chang and the members of his purported classes visited the Wozo website and the websites hosting the aforementioned internet advertisements. D. 23 ¶¶ 40-55, 73-75, 77-79.[7] These

_____

[7] Adknowledge has not asserted that the Rule 9(b) pleading standard should apply here or that Chang's amended complaint fails to meet that standard. <u>See</u> D. 27, D. 38. Chang's

allegations are sufficient to allow Chang's complaint to survive a motion to dismiss, even under the higher pleading standard set by Rule 9(b).

### 4. Allegations Against Adknowledge

Adknowledge asserted in its initial brief that "Chang does not allege any facts alleging that Adknowledge was responsible for or knew about Wozo's poster offer, any content on the Wozo website, or any unlawful charges," and that the allegations in Chang's amended complaint "indicate that he was injured by Wozo–not by Adknowledge." D. 27 at 16. Adknowledge argued that, accordingly, Chang's amended complaint fails to state a claim against Adknowledge (as opposed to against Wozo and Tatto) upon which relief can be granted. D. 27 at 16. Adknowledge's argument misreads Chang's amended complaint, which specifically alleges that Adknowledge, Wozo and Tatto "partnered . . . to offer Super Rewards Points as part of [Wozo and Tatto]'s 'free' poster promotion," D. 23 ¶ 60; that Adknowledge, together with Wozo and Tatto, "created and developed a promotional campaign as joint venturers, including banners and other advertisements offering a free poster and Super Rewards Points to consumers for a 99-cent shipping fee," D. 23 ¶ 60; that "each" defendant "placed such banners and other advertisements on the internet," D. 23 ¶ 60; that these advertisements did not make any reference to the poster club or its $29.99 recurring monthly fee, D. 23 ¶ 60; that "Adknowledge was not simply acting as a neutral intermediary placing internet advertisements for [Wozo and Tatto] in various locations on the internet" but instead "agreed to jointly promote its own product, Super Rewards Points, with [Wozo and Tatto]'s product, a purportedly free poster, in a single advertisement for a single price," D. 23 ¶ 61; and that Chang

---

amended complaint does allege that Adknowledge made fraudulent representations in the aforementioned internet advertisements, to the extent that the advertisements represented to consumers that they would receive Super Rewards Points for a one-time 99-cent fee. D. 23 ¶¶ 60-69.

and members of one of his purported classes are Super Rewards Points users and were harmed when they clicked on these advertisements, filled out order forms on the Wozo website consistent with the terms of these advertisements, and were then subjected to recurring monthly $29.99 fees.  D. 23 ¶¶ 6, 72-75, 78.  Acknowledge may dispute the accuracy of these factual allegations,[8] but resolution of that dispute is appropriate at summary judgment or trial, not at the motion to dismiss stage.

### 5. The Communications Decency Act

Adknowledge's final argument is that the federal Communications Decency Act ("CDA") provides immunity from entities like Adknowledge from claim arising from content created or developed by a third party.  D. 27 at 17-23.  Adknowledge points specifically to section 230 of the CDA, which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" and that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. §§ 230(c)(1), (e)(3).  Under these statutory clauses, an entity "is immunized from a state law claim if:  (1) [it] is a 'provider or user of an interactive computer service'; (2) the claim is based on 'information provided by another

---

[8] The Geroe Affidavit appears to do precisely that, see, e.g., D. 26-1 ¶ 16 (stating that "Adknowledge facilitates the publication of advertisements but does not create or develop advertising content for or on behalf of the advertisers"); ¶ 18 (stating that "Adknowledge plays no role in fulfilling the advertiser's product or offer"), although in some ways it appears to confirm aspects of Chang's allegations.  D. 26-1 ¶ 18 (stating that Adknowledge has an "obligation to consumers . . . to credit them with the appropriate game publisher's [Super Rewards] points upon receiving confirmation from the advertiser that the consumer participated in the offer advertised").  In any event, the only way the Court could consider "matters outside the pleadings" such as the Geroe affidavit for purposes of resolving a motion to dismiss under Rule 12(b)(6) (rather than for purposes of resolving a jurisdictional challenge brought under Rule 12(b)(1)) would be to convert the Rule 12(b)(6) motion into "one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  None of the parties have asked the Court to convert any of then pending Rule 12(b)(6) motions into motions for summary judgment, and the Court declines to do so here.

information content provider'; and (3) the claim would treat [the entity] 'as the publisher or speaker' of that information." Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007). However, "an interactive computer service provider remains liable for its own speech." Id. at 419. Put another way, CDA immunity does not apply if the interactive computer service provider is also an "information content provider," which is defined in the CDA as an entity that is "responsible, in whole or in part, for the creation or development of" any allegedly fraudulent "information." 47 U.S.C. § 230(f)(3).

As discussed above, Adknowledge and Chang dispute whether the content of the internet advertisements at the heart of this case were developed solely by Wozo and Tatto or whether the content was developed at least in part by Adknowledge. Compare D. 23 ¶¶ 6, 72-75, 78 (allegations in Chang's amended complaint) with D. 27 at 17-23, D. 38 at 7-8 (assertions in Adknowledge's various briefs). This is a dispute of fact that cannot be resolved at this juncture.[9]

## VI. Conclusion

For the reasons discussed above, the Defendants' various motions to dismiss are DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge

---

[9] Indeed, the court in Swift v. Zynga Game Network, Inc., No. C-09-05443-SBA, 2010 WL 4569889 (N.D. Cal. Nov. 3, 2010), a case cited in Adknowledge's briefs and described therein as "a pending class action against Adknowledge involving similar allegations over the Super Rewards advertising platform," D. 27 at 19, reached an identical conclusion. See Swift, 2010 WL 4569889, at *6 (holding that "whether Adknowledge qualifies for immunity under the CDA is a fact based inquiry" and that "it would be improper to resolve this issue on the pleadings" and denying Adknowledge's motion to dismiss).